# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JEFFREY HOLLAND,**

                              **Plaintiff,**

**vs.**                                                                 **Civ. No.  10-224 JCH/RHS**

**THE BOARD OF COUNTY
COMMISSIONERS FOR THE
COUNTY OF BERNALILLO;
JOHN DANTIS, individually and in
his official capacity; DWIGHT DIAS,
individually and in his official capacity;
CARL BROACH, individually and in
his official capacity; and CECILIA
BACA, individually and in her
official capacity,**

                              **Defendants.**

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on Motions for Summary Judgment Based on

Qualified Immunity by Defendants John Dantis [Doc. 30], Carl Broach [Doc. 32], Dwight Dias

[Doc. 55] and Cecilia Baca [Doc. 60], as well as on Plaintiff's Motion to Supplement Plaintiff's

Response to Defendants Dantis, Dias, and Broach's Motions for Summary Judgment [Doc. 55].

The Court, having considered the motions, briefs, exhibits, and relevant law, and being otherwise

fully informed, finds that the Qualified Immunity motions of Defendants Dantis, Broach, Dias,

and Baca should be GRANTED in part and DENIED in part, and that Plaintiff's Motion to

Supplement Response should be GRANTED in part and DENIED in part.

## <u>BACKGROUND</u>

This case arises from Plaintiff's allegations that he was terminated from his employment

with Bernalillo County for reporting multiple instances of malfeasance by his co-worker, a man

who was protected by his supervisors because his father was the Deputy County Manager.

Although significant factual disputes exist regarding the some of the details surrounding

Plaintiff's firing, the parties are in agreement on the general outline of the following narrative.

Where alleged facts are contested by Defendants, such objection will be noted.  Because of the

procedural posture of the case, the Court views the following facts in the light most favorable to

Plaintiff and allows Plaintiff the benefit of all reasonable inferences to be drawn from the

evidence.  *See Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1223 (10th Cir. 2008).

On June 21, 2009, the Bernalillo County Department of Substance Abuse Programs ("the

Department) hired Plaintiff Jeffrey Holland to work as a substance abuse technician for the

Metropolitan Assessment and Treatment Services ("MATS") program, a division of the

Department.  The goal of MATS is to provide a coordinated detoxification, recovery, treatment,

and transitional housing program for individuals with severe substance abuse problems.  At all

times relevant to this case, Defendant John Dantis was the Deputy County Manager for

Bernalillo County as well as the Acting Director of the Department of Substance Abuse

Programs.  In this position, Defendant Dantis oversaw the other Defendants.  Defendant Dwight

Dias served as the MATS Program Manager.  In this position, he supervised Defendant Cecilia

Baca, who was the MATS Program Supervisor at all relevant times.  Defendant Baca supervised

substance abuse technicians, including Plaintiff and Defendant Dantis' son, Jamie.  Defendant

Carl Broach was the Department's Clinical Manager at all relevant times.

Plaintiff alleges that Jamie Dantis ("Jamie") had significant substance abuse issues

during the time that Plaintiff worked at MATS, and that he saw Jamie under the influence of

drugs while at work on numerous occasions.  Plaintiff claims that he complained to Defendants

Baca and Broach about Jamie working and interacting with clients while under the influence of drugs, sleeping on the job, and stealing medication from clients.  In addition, Plaintiff alleges that he complained to Defendants Baca and Broach about favorable treatment that Jamie received because his father was Deputy County Manager.  One morning in January of 2009, Plaintiff received a call from Adan Carriaga, the Department's Supervisor (whose direct supervisor was Defendant Dantis).  Mr. Carriaga asked Plaintiff to go to Defendant Dantis' home to participate in an intervention for Jamie, allegedly telling Plaintiff that Defendant Dantis was expecting them.  Present at the intervention were Defendants Dantis, Broach, and Dias, as well as Plaintiff, Defendant Dantis' wife, Mr. Carriaga, and possibly another Bernalillo County employee.  At the intervention, Plaintiff allegedly told Jamie that everyone else at MATS was tired of covering for him, and expressed his concerns about Jamie working under the influence of drugs, sleeping at work, and stealing medication from clients.

In early June, 2009, Plaintiff allegedly received a call from Defendant Baca at his home, in which she claimed to be calling as a friend rather than a boss, and in which she informed him that he should resign, because he was about to be fired.  Defendant Baca allegedly told Plaintiff that orders for his termination were coming "from the top" and that the decision to terminate him was out of her hands.  She also allegedly told Plaintiff that, if he resigned, she would be able to hire him back in a year or so, after "the powers that be" were gone.  Defendant Baca denies having made this call.  The alleged conversation between Defendant Baca and Plaintiff tracks another conversation that Defendant Dantis allegedly had with Melanie Daugherty, another employee of MATS, the weekend before Plaintiff's termination.[1]  According to Ms. Daugherty's

---

[1] This alleged conversation is reflected in an affidavit signed by Ms. Daugherty.  *See* Ex. A to Doc. 55.  This affidavit is the subject of *Plaintiff's Motion to Supplement Plaintiff's*

affidavit, the weekend before Plaintiff was terminated, Defendant Dantis told her that he was "concerned about Jamie Dantis returning to work at MATS with [Plaintiff] working there, and the two could not work together."  Daugherty Affidavit, attached as Ex. A to Doc. 55, at ¶ 9. That same weekend, Defendant Dantis allegedly told Ms. Daugherty that "he had turned the matter concerning [Plaintiff] over to Carl Broach."  *Id.* ¶ 10.  Defendant Dantis denies having made these comments.  Approximately two days after this call from Defendant Baca, Plaintiff was handed a letter signed by Defendant Broach and Defendant Baca, who had signed on behalf of Defendant Dias, terminating him from his position with MATS, effective immediately.  *See* Termination Letter, attached as Ex. C to Doc. 56.

One issue in this case is whether, at the time he was terminated, Plaintiff was a probationary employee or a classified employee.  Probationary employees are terminable-at-will and cannot grieve a disciplinary action, whereas classified employees may only be fired for cause and have the right to grieve a disciplinary action.  Pursuant to Bernalillo County's employment rules and regulations, a new employee hired to fill a classified position must serve a probationary period of nine months, which may be extended in 90-day increments if the employee has not satisfactorily completed the initial probation period.  Plaintiff received his nine month performance review on April 9, 2009, in which Defendant Baca indicated her recommendation that Plaintiff have his probation period extended until July 1, 2009.  However, Defendant Baca did not seek to extend the probation period until May 1, 2009, after Plaintiff had already received a raise and other benefits associated with becoming a classified employee.

---

*Response to Defendants Broach, Dias, and Dantis' Motions for Summary Judgment* [Doc. 55]. For the reasons discussed later in this Memorandum Opinion and Order, the Court finds the alleged conversation reflected in this affidavit to be properly before the Court for consideration in evaluating Defendant Dantis' motion for summary judgment.

Thus, Plaintiff argues that he was already a classified employee at the time that Defendants sought retroactively to extend his probationary period. Plaintiff claims that, because he became a classified employee, he had a protected property interest in his continued employment such that Defendants violated his procedural due process rights and breached his contract by terminating him without allowing him a grievance hearing. Plaintiff also claims that Defendants retaliated against him for reporting Jamie's illegal activities and breaches of Bernalillo County's Policies and Procedures, in violation of his First Amendment rights.

## LEGAL STANDARDS

A. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides for entry of summary judgment where "there is no genuine issue as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Thomas v. IBM*, 48 F.3d 478, 484 (10th Cir. 1995) (citation omitted). In applying this standard, the record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment, in this case, Plaintiff. *See McKnight v. Kimberly Clark Corp.*, 149 F. 3d 1125, 1128 (10th Cir. 1998).

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, "the burden shifts to the nonmovant to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a

rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).  The opposing party may not rest upon "mere allegations and denials in the pleadings...but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986) (citation omitted).  An issue of fact is genuine if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party.  *See id.* at 249.  "The nonmoving party must go beyond the pleadings and establish, through admissible evidence, that there is a genuine issue of material fact that must be resolved by the trier of fact." *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995) (citation omitted).

    B. Qualified Immunity

    Defendants have moved for summary judgment on the basis of qualified immunity. Qualified immunity protects governmental officials performing discretionary functions from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights about which a reasonable person in their position would have known.  *See Harlow v. Fitzgerald*, 457 U.S. 808, 818 (1982).  It protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Biggs*, 475 U.S. 335, 341 (1986).  The doctrine recognizes that officials can act without fear of harassing litigation only if they can reasonably anticipate when their conduct may give rise to liability and only if unsupported lawsuits are quickly terminated.  *See Butz v. Economou*, 438 U.S. 478, 507-508 (1978).  In other words, qualified immunity ensures that officers do not have to endure the burdens of litigation unless they are on notice that their conduct is unlawful.  *See Saucier v. Katz*, 533 U.S. 194, 206 (2001).

    Therefore, in order to overcome a claim of qualified immunity, a plaintiff must (1) plead facts which, if true, would constitute a violation of a statutory or constitutional right; and (2)

demonstrate that the defendants' conduct violated clearly established rights of which a reasonable person in the defendants' position at the time would have known.  *See id*. at 201-202. A right is considered "clearly established" if there is a Supreme Court or Tenth Circuit decision on point, or if the clearly established weight of authority from other courts shows that the right is as claimed by the plaintiff.  *See Farmer v. Perrill*, 288 F.3d 1254, 1259 (10th Cir. 2002). Previous cases need not be identical or even "fundamentally similar" in order to put an official on notice, rather, the "salient question...is whether the state of the law [at the time of the act] gave [defendants] fair warning that their alleged treatment of [plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 741 (2002).  The plaintiff must "demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited."  *Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.2d 1175, 1184 (10th Cir. 2010).  Defendants are asserting that qualified immunity bars Plaintiff's due process and First Amendment retaliation claims.

## DISCUSSION

A.   <u>Due Process</u>

In order to prevail on a procedural due process claim, "a plaintiff must first establish that a defendant's actions deprived plaintiff of a protectible property interest."  *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000).  In the context of government employment, "[a] public employee facing discharge is entitled to the safeguards of procedural due process only if he can demonstrate that the termination implicates a property or liberty interest protected by the Due Process Clause."  *Sipes v. United States*, 744 F.2d 1418, 1420 (10th Cir. 1984).  Those who are probationary employees have no constitutionally protected property interest in continued employment, and therefore are not entitled to procedural due process

protections. *Id.* at 1421. Plaintiff does not dispute that, if he was a probationary employee, he

would not be entitled to procedural due process prior to termination. Instead, he contends that, at

the very least, a question of fact exists regarding whether he had become a classified employee at

the time he was terminated.

Section 402(A) of the Employment Relations Rules and Regulations for Bernalillo

County ("County Rules") specifies that employees hired to fill a classified position shall serve a

probationary period of nine months, except that the probationary period may be extended as

provided for in the County Rules.[2] County Rules, attached as Ex. B to Doc. 30, at 1. Section

402(C)(1) of the County Rules provides that a probationary employee shall receive written

performance appraisals at the completion of the first 90 days of his probationary period and two

weeks before the end of the probationary period. *Id.* at 2. The employee must receive a final

performance appraisal of satisfactory or better before the employee can become a classified

employee who is entitled to all of the rights and benefits of that status, including grievance

procedures. *Id.* The completed final performance appraisal and a personnel action notice must

be submitted to the County's Human Resource Department at least a week prior to the end of the

probationary period. *Id.* Although probationary employees accrue annual and sick leave, they

are not vested in their annual leave and are not permitted to use annual leave or personal

holidays during their probationary period. *Id.* at 3, section 402(F). Pursuant to section

402(C)(2), "[i]f the employee has not satisfactorily completed the nine (9) month probationary

period, the probationary status may be extended in ninety-day (90) increments, not to exceed one

---

[2] Although section 402(A) indicates that the probationary period may be extended as
provided for in section 402(D)(2), the County Rules do not contain a section 402(D)(2). Instead,
it appears that the provisions for extending the probationary period are contained in section
402(C)(2).

hundred eighty (180) days." *Id*. at 2.

Plaintiff was hired on June 21, 2008. *See* Three Month Performance Evaluation, attached as Ex. F to Doc. 36, at 1. Plaintiff received his first performance evaluation on November 21, 2008. *Id*. In that evaluation, Plaintiff received satisfactory marks in each of fourteen categories, and was graded as making satisfactory progress toward full job performance. *Id*. Plaintiff's supervisor, Defendant Baca, commented that he "is a great employee who is self motivated. Needs more supervision regarding client assessments." *Id*. at 2. Two months later, Plaintiff received his six-month evaluation. *Id*. at 3-4. In this evaluation, Plaintiff received satisfactory marks in each category except "ability to accept directions." *Id*. at 3. Plaintiff was again graded as making satisfactory progress toward full job performance. *Id*. at 4. Defendant Baca commented that "Mr. Holland is able to demonstrate competency in work related duties. Has to be reminded to follow certain program protocols–no cell phone use on unit or wearing hats on unit." *Id*.

On April 9, 2009, Defendant Baca completed Plaintiff's nine-month evaluation. *Id*. at 5-6. This timing corresponds with section 402(C)(1) of the County Rules, specifying that probationary employees are to receive performance appraisals two weeks before the end of their probationary period, which, in Plaintiff's case, was scheduled to end on April 21, 2009. Plaintiff's nine-month evaluation again gave him satisfactory marks in every category, and listed him as making satisfactory progress toward full job performance. *Id*. Nevertheless, Defendant Baca commented that she "recommend[s] that staff [continue] with probation until July 1. Staff is directed to repeat confidentiality training/professional boundaries." *Id*. at 6. Plaintiff acknowledged receipt of this evaluation on April 12, 2009.

Because Plaintiff was hired on July 21, 2008, his probationary period was scheduled to

end on April 21, 2009.  Plaintiff's nine-month evaluation gave him a performance appraisal of satisfactory, which is a requirement if the employee is to become a classified employee.  *See* County Rules section 402(C)(1).  Beginning with the pay period after which his probationary period was scheduled to end, Plaintiff received a raise of over 6 percent (from \$14.04/hour to \$14.92/hour).  *See* Ex. E, attached to Doc. 36, at 1-2.[3]  In addition, in the month after his probationary period was scheduled to end, Plaintiff was also able to take a half hour of vacation time, which is a benefit available only to classified employees.  *See id.* at 3.

Defendants argue that Plaintiff was a probationary employee at the time he was terminated because he never became a classified employee and instead had his probationary period extended.  However, Defendant Baca did not file a formal Request for Extension of Probationary Period until May 1, 2009.  *See* Ex. B, attached to Doc. 66.  The form sought to extend the probationary period from April 21, 2009 to July 1, 2009.  *Id.*  As a justification for the extension, Defendant Baca wrote "Jeff needs continued training with professional boundaries and confidentiality."  *Id.*  Plaintiff also signed this form on May 1, 2009.  *Id.*  The form was not signed by Adan Carriaga until May 14, 2009.  *Id.*  The Bernalillo County Extension of Probation form, purporting to extend the probationary period until July 1, 2009, was also signed by both Defendant Baca and Plaintiff on May 1, and signed by Mr. Carriaga on May 11.[4]  Thus, Plaintiff

---

[3] Plaintiff contends that a pay raise is given to employees upon their successful completion of the probationary period.  *See* Pl. Resp. to Def't Baca's MSJ [Doc. 66] at 9 ¶ 23. However, the section of the County Rules that he cites for this proposition, section 402(F), does not mention pay raises, nor has Plaintiff identified any other portion of the County Rules that addresses pay raises.

[4] Interestingly, by seeking to extend the probationary period until July 1, 2009, a period less than the ninety-day increment specified by section 402(C)(2) of the County Rules, Defendants appear to have deviated from the published procedures.

argues, he had already become a classified employee by the time Defendants sought to extend his probation retroactively, and he could not be terminated without a grievance process.

Defendants have not pointed to any provision in the County Rules that allows a retroactive extension of a probationary period, nor have they shown that a probationary period is extended based solely on the recommendation of an immediate supervisor on an evaluation form as opposed to when a Request for Extension of Probationary Period is approved.  Viewing the facts in the light most favorable to the non-movant, Plaintiff has established a material question of fact as to whether he was still a probationary employee at the time of his termination.  If, in fact, he was a classified employee at the time of his termination, he would have been entitled to a grievance procedure and denial of that process would have been a violation of his constitutional rights.

However, demonstrating a violation of a constitutional right is only one hurdle Plaintiff must surmount if he is to overcome a defense of qualified immunity.  Plaintiff must also demonstrate that Defendants' conduct violated clearly established rights of which a reasonable person in Defendants' position at the time would have known.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).  In doing so, Plaintiff "must do more than identify in the abstract a clearly established right and allege that the defendant has violated it."  *Swanson v. Town of Mt. View*, 577 F.3d 1196, 2000 (10th Cir. 2009) (internal quotation marks and citation omitted).  Instead, while Plaintiff need not cite a case with an identical factual situation, "he still must show legal authority which makes it apparent that in the light of pre-existing law a reasonable official would have known that the conduct in question violated the constitutional right at issue."  *Id.* (internal quotation marks and ellipsis omitted).  He must demonstrate that existing Supreme Court or Tenth Circuit law, or the clearly established weight of authority from other circuits, established

11

that Defendant's actions were clearly prohibited.  See *Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.2d 1175, 1184 (10th Cir. 2010).  For the law to be clearly established, thereby rendering a qualified immunity claim inapplicable, the law must have been developed in such a concrete and factually defined context to make it obvious to all reasonable governmental actors in the defendant's place that what the defendant is doing violates federal law.  *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Therefore, in order to overcome Defendants' qualified immunity defense, Plaintiff would have had to demonstrate that reasonable officials in Defendants' positions would have known that he became a classified employee by default on April 21, 2009, such that an attempt to terminate him without affording him access to the County's grievance procedure was a clear violation of his due process rights.  Plaintiff has made no real attempt to cite cases on which he is relying to argue that the law was clearly established, and he has not identified any case law indicating that a delay in submitting a request for an extension of probation, especially in light of an announced intention to seek an extension of probation, would clearly result in his becoming a classified employee by default.[5]  Moreover, at least one Tenth Circuit case has held that an

---

[5] Plaintiff has submitted a Notice of Supplemental Authority, notifying the Court of a recent New Mexico Court of Appeals decision, *City of Albuquerque v. AFSCME Council 18*, 2011-NMCA-021.  This case held that a City employee had a reasonable expectation of continued employment when she was congratulated by her supervisor for successfully completing her probationary period and her supervisor approved a "completion of probation" memorandum prior to the subsequent issuance of a memorandum purporting to extend her probationary period.  This case is inapposite because there is no evidence in this case that any of the individual Defendants made any statements that caused him to believe that he was being made a classified employee.  In fact, Plaintiff was always led to believe that his probationary period would be extended.  Moreover, even if this case were on point, it would not be relevant to the Court's decision on Defendants' qualified immunity claims, because it does not help to demonstrate that any right to continued employment was clearly established at the time of Plaintiff's termination in 2009.

employee's knowledge and tacit acceptance of an extended probationary period prevents the employee from later arguing that the probationary period had ended by default prior to termination.  *See Meiners v. Univ. of Kansas*, 359 F.3d 1222, 1236-37 (10th Cir. 2004).  In this case, Plaintiff knew of the intention to extend his probationary period on April 9, 2009, and he signed both the Request for Extension of Probationary Period and the Extension of Probation forms on May 1, 2009, apparently without voicing any concerns.  He has failed to show that the law was clearly established such that Defendants should have had fair warning that they could not terminate him without a grievance hearing, and therefore his due process claim against Defendants must be dismissed.[6]

> B.   <u>First Amendment</u>

Although Plaintiff's due process claim is dismissed on qualified immunity grounds, the Court must still examine whether he can bring a First Amendment claim, because even probationary employees who are terminable at will are entitled to First Amendment protection. *See Rankin v. McPherson*, 483 U.S. 378, 383-84 (1987); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *Anderson v. McCotter*, 100 F.3d 723, 726-27 (10th Cir. 1996).  Plaintiff claims that he was discharged in retaliation "for exercising his rights of free speech by reporting illegal activities [and] violations of Bernalillo County Policies and Procedures" by Jamie Dantis. Amended Complaint [Doc. 18] ¶ 53.  Plaintiff alleges that he reported to Defendants Baca, Dias, and Broach that Jamie was frequently coming to work intoxicated and under the influence of illegal drugs, that Jamie was allowed to meet with MATS clients while intoxicated or under the

---

[6] Although Plaintiff's due process claim against the individual Defendants is dismissed on qualified immunity grounds, his claim against Defendant Bernalillo County for breach of contract remains.

influence of drugs, and that Jamie assisted a client of MATS in obtaining illegal drugs.  *See id.*
¶¶ 24, 26, 27, 28.  Plaintiff also alleges that Defendant Dantis knew that Plaintiff had reported
Jamie's actions to his supervisors.  *Id.* ¶ 30.[7]

In analyzing Plaintiff's claim that his free speech rights were violated, the Court must
determine: (1) whether Plaintiff's speech was protected, and (2) if the speech was protected,
whether the law regarding Plaintiff's speech was well established at the time of the alleged
violation.  *See Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1327 (10th Cir. 2007).
An analysis of First Amendment claims consists of five prongs:  (1) The court must first
determine whether the employee was speaking pursuant to his official duties; (2) if it is
determined that the employee was not speaking pursuant to his official duties, the court must
then determine whether the subject of the speech is a matter of public concern; (3) if the
employee was speaking as a citizen about a matter of public concern, the court must determine
"whether the employee's interest in commenting on the issue outweighs the interest of the state
as employer"; (4) if the employee's interest in speaking outweighs that of the employer, the
employee must demonstrate that the speech was a "substantial factor or a motivating factor in [a]
detrimental employment action"; and (5) if the employee is able to demonstrate that his speech
was a motivating factor in an adverse employment action, "the employer may demonstrate that it
would have taken the same action against the employee even in the absence of the protected
speech."  *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F. 3d 1192, 1202-03 (10th Cir.

---

[7] Plaintiff attempts to bolster his retaliation claim through hearsay evidence from
individuals that he and his attorney interviewed purporting to establish that Jamie bragged about
getting Plaintiff fired and that Jamie had threatened to get other MATS employees fired.  *See*
Holland Affidavit, attached as Ex. A to Doc. 38 at ¶¶ 22-23; Van Meter Affidavit, attached as
Ex. B to Doc. 38 at ¶¶ 1-4, 7.  Because these purported statements of other witnesses are hearsay
without any identifiable exception, the Court did not consider them in reaching its decision.

2007).  The first three of these prongs are to be resolved by the district court, while the last two are ordinarily left in the hands of the trier of fact.  *Id.* at 1203.

### 1.  Was Speech Made Pursuant to Official Duties?

Under the first prong of the test set forth in *Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006),  the Court must initially determine whether Plaintiff engaged in any of the instances of speech at issue pursuant to his official duties.  When public employees speak "pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Garcetti*, 547 U.S. at 421.  If an employee speaks pursuant to his official duties, he has no constitutional protection because the restriction on speech "simply reflects the exercise of employer control over what the employer itself has commissioned or created."  *Id.* at 422.  The Tenth Circuit has defined this test as follows: if a public employee "engages in speech during the course of performing an official duty and the speech reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties" and is not protected by the First Amendment.  *Brammer-Hoelter*, 492 F.3d at 1203.  In conducting this inquiry, "the proper focus is ultimately still whether the speech stemmed from and was of the type that the employee was paid to do."  *Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 746 (10th Cir. 2010) (citation and internal quotation marks omitted).  Not all speech "about the subject matter of an employee's work [is] necessarily made pursuant to the employee's official duties."  *Brammer-Hoelter*, 492 F.3d at 1204.  The determination of whether a public employee's speech was made pursuant to his official duties is a question of law, and at the summary judgment stage the Court views the facts in the light most favorable to Plaintiff as the non-movant.  *See id.*

*Garcetti* involved a prosecutor in the Los Angeles District Attorney's Office. The plaintiff was a prosecutor who prepared an internal office memorandum recommending dismissal of a case that was being pursued by the office. The memorandum led to a confrontation with his supervisors, after which he was transferred and denied a promotion. The Supreme Court found that the prosecutor's statements were made pursuant to his official duties and therefore unprotected. The Court explained that the plaintiff in that case was speaking in his role "as a prosecutor fulfilling a responsibility to advise his supervisors about how best to proceed," so that his speech was "commissioned" by his employer. *Garcetti*, 547 U.S. at 421-22.

Defendants contend that Plaintiff raised his complaints about Jamie's malfeasance pursuant to his official duties, and that the complaints are therefore not protected speech. Defendants argue that, because Plaintiff worked as a substance abuse technician and had the responsibility of assisting clients with severe substance abuse problems, the reporting of his co-worker's substance abuse problems to his supervisors arose out of his official duties. *See* Dantis MSJ [Doc. 30] at 9; Dias MSJ [Doc. 55] at 7; Baca MSJ [Doc. 60] at 9. Certainly, speech may be considered within the scope of an employee's official duties even if it is "not explicitly required as part of [an employee's] day-to-day job" or "the speech concerns an unusual aspect of an employee's job that is not part of his everyday functions." *Rohrbough*, 596 F.3d at 747 (citations omitted). However, Plaintiff's job responsibilities were to provide services to MATS clients, not to provide substance abuse counseling services to co-workers or to report the drug-related malfeasance of co-workers. Moreover, some of the instances of Jamie's violations of personnel rules that Plaintiff reported to his supervisors, such as sleeping on the job and helping a client obtain drugs, did not directly implicate Jamie's substance abuse. Thus, Plaintiff did not

16

have "a responsibility to advise his supervisors about how best to proceed," and his speech was not "commissioned" by his employer. *Garcetti*, 547 U.S. at 421-22. Plaintiff's speech is no less protected merely because he made it during work hours and it concerned the subject matter of his employment. *See id.* at 421; *Brammer-Hoelter*, 492 F.3d at 1204.

Defendant Baca analogizes this case to *Casey*, in which a school district's Superintendent and CEO of the district's Head Start program was demoted and ultimately fired after bringing issues regarding the Head Start program's compliance with federal regulations to the attention of the local school board. *See* Baca MSJ [Doc. 60] at 9. The Tenth Circuit held that Ms. Casey's statements regarding the school district's compliance with federal regulations were made pursuant to her official duties and were, therefore, not protected by the First Amendment. 473 F.3d at 1330-31. Defendant Baca characterizes the *Casey* court's scope of duties analysis as "lead[ing] to the determination that a subordinate employee reporting improprieties in a supervisor's handling of federal financial aid funds was not protected speech" and contends that "[t]his case is not factually distinct from *Casey* in any appreciable manner." Baca MSJ [Doc. 60] at 9-10.

On the contrary, the substantially different facts of *Casey* help demonstrate exactly why Plaintiff was not acting within the scope of his official duties when he repeatedly reported Jamie's transgressions. Ms. Casey served in a senior management position. The *Casey* court recognized that "Ms. Casey was designated by the Board as the CEO and person primarily responsible for the sound administration of the District's Head Start program" and it concluded that she made the statements pursuant to her official duties "because advising her employer on 'the lawful and proper way to conduct school business' was admittedly part of her portfolio." 473 F.3d at 1329-30 (citation omitted). Significantly, the court concluded that Ms. Casey's

responsibilities as executive director included a duty to report the District's noncompliance with federal regulations, because she "risked civil and criminal liability" if she remained silent in the face of knowledge of financial irregularities. *Id*. at 1330. The court characterized its holding as reflecting the "narrow[] and subtle[] set of facts in which the plaintiff's job, as the chief overseer of Head Start for the District, included the sound administration of federal funds; federal law directed the disclosure of any irregularities in the use of such funds; the plaintiff conceded that her job duties required her to report to federal authorities; and she acted in a manner consistent with this admission." *Id*. at 1331.

In contrast, Plaintiff held no leadership or supervisory role at MATS; he was an entry-level counselor. He had no responsibility to ensure that the program ran smoothly or that his co-workers operated in compliance with the law. He did not risk any civil or criminal liability if he failed to report the violations occurring in his midst. Simply put, reporting his concerns about the dangerous and unprofessional behavior of his co-worker was not what Plaintiff "was paid to do." *Rohrbough*, 596 F.3d at 741.

Defendants also cite *Rohrbough* in arguing that Plaintiff was speaking pursuant to his official duties. *Rohrbough* concerned complaints made by the Transplant Coordinator of the University of Colorado Hospital Authority's Heart Transplant Unit. Ms. Rohrbough communicated to those in her chain of command her concerns about what she perceived to be a "staffing crisis" affecting the quality of care transplant patients received. *Id*. at 743. She also composed a number of incident reports alleging instances of substandard care that she observed. *Id*. at 744. Finally, she reported information regarding a possible heart transplant misallocation to hospital officials and reported a potential hospital cover-up regarding the misallocation to the United Network for Organ Sharing ("UNOS"), an entity established by Congress to administer

18

organ transplants.  *Id*.  As Transplant Coordinator, Ms. Rohrbough was responsible for

communicating with UNOS to put patients on transplant lists, remove patients from the lists, and

provide information about particular transplants, and, in reporting to UNOS her belief that a

heart had been misallocated, she identified herself as the hospital's Transplant Coordinator.  *Id*.

 The court found that Ms. Rohrbough's reports of a "staffing crisis" were made pursuant

to her official duties because, by her own admission, the staffing shortage affected her ability to

do her job as the Transplant Coordinator and it was her responsibility to ensure that transplant

patients received appropriate care.  *Id*. at 748.  The court found that Ms. Rohrbough's reports

documenting instances of alleged substandard care that transplant patients received were

similarly made pursuant to her official duties as Transplant Coordinator.  It noted that she wrote

the reports at the behest of the hospital's Risk Management Unit and that hospital policies

required all employees to file incident reports if they witnessed unsafe conditions, errors, or near

misses.  *Id*.  Thus, it concluded that her "reporting about the conditions affecting her ability to

fulfill her duties as Transplant Coordinator at the Hospital undoubtedly was an activity that

'stemmed from and [was of] the type...that she was paid to do.'"  *Id*. (citation omitted).  Finally,

the court found that Ms. Rohrbough's report to other hospital officials regarding the alleged

heart misallocation and her suspicions that hospital officials would attempt a cover-up with

UNOS fell within the scope of her official duties because her responsibilities included

monitoring heart allocations and interacting with UNOS, so that her internal discussions of these

matters were the type of activities she was paid to do.  *Id*. at 750.  The court did not reach the

question of whether her reporting of the alleged cover-up to UNOS fell within the scope of her

official duties because it found that she had presented no evidence that this report was a

motivating factor in her adverse employment action, so that she could not survive the fourth

prong of the *Garcetti* analysis.  *Id.*

As with *Casey*, the facts of *Rohrbough* vary sufficiently from this case as to make it inapposite.  Plaintiff did not have a management role as Ms. Rohrbough did.  He was apparently not required by law or County policy to report violations of personnel rules or unsafe conditions, nor had he been asked by his supervisors to make such reports–in fact, according to his testimony, he was actively discouraged from making his reports.  Quite simply, Plaintiff's job was not to ensure that the MATS program functioned smoothly or that all patients received proper care; he was an entry-level employee whose job duties created an obligation only to his own clients.  Viewing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff's reports concerning Jamie plainly did not stem from the type that he was paid to do, and thus clearly were not made pursuant to his official duties.

## 2.  Was Speech About a Matter of Public Concern?

Because Plaintiff's reports of Jamie's malfeasance were not made pursuant to his official duties, the Court must next determine whether the reports addressed matters of public concern. In deciding whether speech implicates a matter of public concern, courts consider "the content, form, and context of a given statement, as revealed by the whole record."  *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).  Speech involves a matter of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Witham v. Baptist Health Care of Okla., Inc.*, 98 F.3d 581, 583 (10th Cir. 1996) (quoting *Connick*, 461 U.S. at 146).  Speech "which discloses any evidence of corruption, impropriety, or malfeasance on the part of city officials, in terms of content, clearly concerns matters of public import."  *Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir. 1998).  *See also Connick,* 461 U.S. at 148 ("actual or potential wrongdoing or breach of public trust by a public official constitutes a

matter of public concern"). On the other hand, speech pertaining to internal personnel disputes and working conditions ordinarily does not involve matters of public concern. *See Gardetto v. Mason*, 100 F.3d 803, 812 (10th Cir. 1996). Courts should "focus[] on the motive of the speaker in analyzing whether the speech qualifies as a matter of public concern, *i.e.,* whether the speech *was calculated* to disclose misconduct or dealt with only personal disputes and grievances with no relevance to the public interests." *Conaway*, 853 F.2d at 796 (emphasis in original).

Defendants characterize Plaintiff's claim as "merely complain[ing] to his supervisor about the favorable treatment Jamie Dantis was receiving." Reply in Support of Dantis MSJ [Doc. 45] at 7; Reply in Support of Dias MSJ [Doc. 64] at 5. The Court agrees with Defendants that complaints about favorable treatment received by a co-worker fall under the category of a personal dispute or grievance, and is not speech on a matter of public concern. Similarly, Plaintiff's statement at Jamie's intervention that he and other MATS employees were tired of covering for Jamie is more in the nature of an internal personnel dispute or complaint about working conditions that likewise does not rise to the level of a public concern.

However, Defendants' characterization of Plaintiff's claim as merely identifying complaints about favorable treatment casts his contentions far too narrowly and ignores his reports about wrongdoing that could have put the entire MATS program at risk. Plaintiff alleges that he informed Defendants Baca, Dias, and Broach that Jamie was frequently reporting to work intoxicated and under the influence of illegal drugs, that he was seeing clients while in an impaired condition, that he helped a client to obtain illegal drugs, and that he stole medication from clients. Allegations of this type of misconduct going on in a public program are far broader than a personal dispute or private grievance, and implicate public concerns. Considering the context of the conversations Plaintiff had with several layers of supervisors, his speech could be

considered to have been calculated to disclose misconduct, and he "raised his concerns in a manner reasonably calculated to compel...compliance with the law." *Baca v. Sklar*, 398 F.3d 1210, 1220 (2005).  The fact that Plaintiff raised his concerns internally to his supervisors rather than publicly does not prevent them from being considered matters of public concern.  *See Garcetti*, 547 U.S. at 420.  *See also Starret v. Wadley*, 876 F.2d 808, 816 n.11 (10th Cir. 1989) ("It is settled that when the First Amendment would protect a employee's statements, the fact that the employee makes the statements privately to the employer rather than publicly does not eliminate the Constitution's protections").  As such, Plaintiff's multiple reports of Jamie's misconduct involved a matter of public concern, and thus constitute protected speech.

Plaintiff cites *Starret* and *Jandro v. Foster*, 53 F. Supp. 2d 1088 (D. Colo. 1999) as establishing that a public employee's complaint about a co-worker's on-the-job alcohol abuse is a matter of public concern.  Defendants attempt to distinguish this case from *Starret* and *Jandro* because *Starret* involved a subordinate employee making statements about the on-the-job drinking of the County Assessor, a high-ranking, elected public official, and *Jandro* involved statements by subordinate employees regarding on-the-job alcohol abuse by the district attorney, likewise an elected official.  *See* Reply in Support of Dantis MSJ [Doc. 45] at 7; Reply in Support of Dias MSJ [Doc. 64] at 5.  However, as the Tenth Circuit has "held many times, speech reporting the illicit or improper activities of a government entity or its agents is obviously a matter of great public import." *Casey*, 473 F.3d at 1331.  This characterization of well-established law on the subject of public concern clearly does not limit protection only to those reports concerning the malfeasance of those in the upper echelons of government.  In fact, one of the cases cited in *Casey* as a basis for this well-established law, *Schalk v. Gallemore*, 906 F.2d 491 (10th Cir. 1990), involved an employee of a municipal hospital who raised concerns about

22

waste and inefficiency at the hospital by bringing to light such low-level rule breaking as kitchen workers not paying for their food, co-workers leaving to take children to school, and other salaried employees working six hours per day rather than eight.  *Schalk*, 906 F.2d at 492-93. The court found that Ms. Schalk's complaints were matters of public concern, and were not exempt from public concern status merely because she became aware of them as a result of her employment.  *See id*. at 495.  Similarly, another case cited by Plaintiff, *Sullivan v. Ramirez*, 360 F.3d 692 (7th Cir. 2004) found that notes keeping track of the amount of time their co-workers spent at the office that the plaintiffs kept as part of their personal investigation into potential timekeeping fraud constituted speech on a matter of public concern, even though the co-workers were not high-level employees or elected officials.  *Sullivan*, 360 F.3d at 699-700.[8]  The Court holds that the law was clearly established that reports bringing to light the illicit or improper conduct of a government employee, such as those made in this case, constitute matters of public concern.  This is especially true given the context of this case, where the reports of continued misconduct on the part of Plaintiff's co-worker potentially implicated a high-ranking County official (Defendant Dantis) in allowing such behavior to continue.

### 3.  Does Speech Satisfy Remaining Factors?

Because portions of the speech at issue addressed a matter of public concern, the Court must proceed to ask whether Plaintiff's interest in raising the issue outweighs the interest of the state, as an employer, in promoting workplace efficiency by preventing such speech.  *See Dill v.*

---

[8] Defendants Dantis and Dias contend that *Sullivan* is "completely inapplicable" because it "does not include any discussion of comments regarding alcohol abuse by public employees." Reply in Support of Dantis MSJ [Doc. 45] at 8; Reply in Support of Dias MSJ [Doc. 64] at 5. This characterization of the Court's inquiry is overly narrow.  The Court must determine when allegations of malfeasance by a government employee constitute matters of public concern; the inquiry is not limited to allegations of alcohol abuse.

*City of Edmond*, 155 F.3d 1193, 1201 (10th Cir. 1998) (citing *Pickering*, 391 U.S. at 568)).  In

performing this balancing, the statements should "not be considered in a vacuum; the manner,

time, and place of the employee's expression are relevant, as is the context in which the dispute

arose." *Rankin v. McPherson*, 483 U.S. 378, 389 (1987).  The Supreme Court has "recognized

as pertinent considerations whether the statement impairs discipline by superiors or harmony

among coworkers, has a detrimental impact on close working relationships for which personal

loyalty and confidence are necessary, or impedes the performance of the speaker's duties or

interferes with the regular operation of the enterprise." *Id.* (*citing Pickering,* 391 U.S. at 570-

73).  In this case, Defendants have presented no evidence that Plaintiff's reports of Jamie's

misconduct were sufficiently disruptive to the Department's operation such that his First

Amendment rights should be eliminated.  *See Casey*, 473 F.3d at 1333 (placing burden on

defendants to provide sufficient evidence of disruption); *Starret*, 876 F.2d at 817 ("Defendants

have not met their burden of showing that restriction of plaintiff's comments was 'necessary to

prevent the disruption of official functions or to insure effective performance by the employee'")

(citation omitted).  In fact, far from arguing that Plaintiff's allegations created problems for the

Department, Defendants contend that his reports had nothing to do with his termination.  The

Court therefore finds that Plaintiff's right to warn supervisors about a co-worker's behavior that

could severely undermine the Department's work with a population of vulnerable clients

outweighs any interest the supervisors would have in keeping news of Jamie's transgressions

quiet.

 Assuming that Plaintiff had a First Amendment right to report his co-worker's

malfeasance to his supervisors, he must still be able to demonstrate that his speech was a

"substantial factor or a motivating factor in [a] detrimental employment action" and withstand

evidence from Defendants that they would have taken the same action against him even in the absence of the protected speech. *See Brammer-Hoelter*, 492 F.3d at 1203. The determination of whether a plaintiff has met these last two hurdles is a question of fact rather than law, and is generally left for the trier of fact. *See id.*; *Thomas v. City of Blanchard*, 548 F.3d 1317, 1327 (10th Cir. 2008). Although Defendant Baca disputes this, Plaintiff contends that she informed him just prior to his termination that he was being fired on orders from "the top" and that she would rehire him when the "powers that be" were gone. Plaintiff also has presented an affidavit from a witness who testified that Defendant Dantis told her that he was concerned about Jamie returning to work if Plaintiff was still there, and that he had turned over the matter concerning Plaintiff to Defendant Broach. Finally, although Defendant Baca claims that Plaintiff was fired for confidentiality and boundary issues, Plaintiff's evaluations prior to his termination were all satisfactory, and he contends that he was not counseled for failure to maintain appropriate boundaries. The Court finds that, viewing the facts as currently developed in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff's repeated reports of Jamie's on-the-job intoxication, its effect on his interaction with substance abuse clients, his stealing of medication from clients, and his assisting a client in obtaining illegal drugs was a substantial or motivating factor in his abrupt termination.

  C. <u>Personal Participation</u>

  Defendants Dantis and Broach contend that they are entitled to qualified immunity because Plaintiff has provided no evidence that either of them had any personal participation in his termination. It is well-established that vicarious liability is inapplicable to § 1983 suits, so that a plaintiff must demonstrate that each defendant, through that official's own individual actions, violated the Constitution. *See Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). Although

there is no concept of *respondeat superior* liability under § 1983, a supervisor may be held liable if the plaintiff can demonstrate an "affirmative link" between the constitutional deprivation by a subordinate employee "and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008). Thus, in order to survive summary judgment, Plaintiff must present evidence creating a question of fact regarding whether either Defendant Dantis or Broach personally participated in making personnel decisions involving Plaintiff, controlled or directed personnel determinations involving him, or had responsibility for approving such determinations. *See Thomas*, 548 F.3d at 1328-29.

### 1. Admissibility of Daugherty Affidavit

When Plaintiff initially filed his responses to Defendants Dantis and Broach's motions for summary judgment, Melanie Daugherty was undergoing treatment for a serious medical condition and had consequently been unable to provide an affidavit. *See* Plaintiff's Motion to Supplement Responses [Doc. 54] at 2. Subsequently, Ms. Daugherty was able to provide an affidavit. As discussed previously, Ms. Daugherty's affidavit states that, the weekend before Plaintiff was fired, Defendant Dantis told her that her was concerned about Jamie Dantis returning to work at MATS while Plaintiff still worked there, and that Jamie and Plaintiff could not work together. *See* Daugherty Affidavit, attached as Ex. A to Doc. 54] at ¶ 9. The affidavit also states that, that same weekend, Defendant Dantis told her that he had turned the matter concerning Plaintiff over to Defendant Broach. *Id*. at ¶ 10.

Defendants Dantis and Broach both object to admission of the affidavit on the grounds

that the statements allegedly made by Defendant Dantis are hearsay.[9]  The content or substance of an affidavit produced in opposition to a motion for summary judgment must be of the type that would be admissible at trial, so that hearsay testimony that would be inadmissible at trial does not somehow become admissible simply by being included in an affidavit.  *See Johnson v. Weld County*, 594 F.3d 1202 (10th Cir. 2010).  Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  In order to be admissible, the statements ascribed by Ms. Daugherty to Defendant Dantis must be admissible under an exception to the hearsay rule as provided for in the Federal Rules of Evidence.  In this case, an exception to the hearsay rule allows for admission of the affidavit against Defendant Dantis, but not against Defendant Broach.[10]

          a. <u>Defendant Dantis</u>

One exception to the hearsay rule is an admission by a party opponent.  *See* Fed. R. Evid. 801(d)(2).  A statement is not considered hearsay if it is offered against a party and is "the party's own statement, in either an individual or a representative capacity."  Fed. R. Evid. 801(d)(2)(A).  The statements allegedly made by Defendant Dantis are his own statements and

---

[9] Both Defendants also object to inclusion of the affidavit on the grounds that it contains an impermissible legal conclusion, *i.e.*, that Plaintiff's complaints constitute a matter of public concern, and a conclusory statement without a factual basis, *i.e.*, that Defendant Broach participated in decisions regarding the hiring and firing of MATS employees.  Because the Court has not considered either of these statements in the affidavit in ruling on the motions for summary judgment, these statements are not relevant to its decision regarding whether the affidavit should be admitted to supplement Plaintiff's responses.

[10] Although Plaintiff's motion was styled as a motion to supplement his responses to Defendants Broach, Dantis, and Dias' motions for summary judgment, Plaintiff clarified that he is only seeking to supplement his responses to Defendants Broach and Dantis' motions.  *See* Reply to Motion to Supplement [Doc. 62] at 1 n.1.

are offered against him to create a question of fact regarding his personal participation in terminating Plaintiff.  They are therefore admissible under Fed. R. Evid. 801(d)(2)(A).

### b. Defendant Broach

Plaintiff argues that he should also be able to use the statements in Ms. Daugherty's affidavit to respond to Defendant Broach's motion for summary judgment pursuant to the admission by a party-opponent exceptions found in Fed. R. Evid. 801(d)(2)(C), (D), and (E). Under these exceptions, a statement is not hearsay if:

> [t]he statement is offered against a party and is...(C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

Fed. R. Evid. 801(d)(2).

However, exceptions (C) and (D), and the cases cited by Plaintiff in support of his argument that these exceptions should apply, are inapplicable to the type of situation presented here.  As illustrated by the cases cited by Plaintiff, exceptions (C) and (D) come into play when the statement is sought to be introduced against an employer, not against a subordinate employee.  In this case, Defendant Dantis' statements were not made "by a person authorized by [Defendant Broach] to make a statement concerning the subject," nor were they made "by [Defendant Broach's] agent or servant."  If Plaintiff were seeking to admit Defendant Dantis' statements against his employer, the Board of County Commissioners, an inquiry into whether he was authorized to make such statements and whether he made them in his capacity as an agent would be appropriate.  As it is though, such exceptions are clearly inapplicable when Plaintiff seeks to attribute Defendant Dantis' alleged statements to Defendant Broach.

28

Plaintiff also argues that the exception for a statement of a coconspirator found in Rule 801(d)(2)(E) should apply.  In order to rely on the coconspirator exception, the proponent of the evidence must show that a conspiracy existed, that the declarant and the party against whom the statement is sought to be admitted were members of the conspiracy, and that the statements were made in the course of and in furtherance of the conspiracy.  *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1081 (10th Cir. 2006).  In determining whether a conspiracy exists, "the court may consider the hearsay statement sought to be admitted, along with independent evidence tending to establish the conspiracy."  *Id*.  A charge of criminal conspiracy is not required for the exception of Rule 801(d)(2)(E) to apply, because conspiracy as an evidentiary rule is founded on concepts of agency law, so that the only inquiry is whether there was a concert of action.  *See United States v. Bucaro*, 801 F.2d 1230, 1232 (10th Cir. 1986).

Plaintiff contends that the statements in Ms. Daugherty's affidavit, along with other evidence, show a conspiracy on the part of Defendants to violate Plaintiff's Constitutional rights because he spoke out against Jamie's substance abuse and related behavior at MATS.  Even assuming, solely for the purpose of deciding whether Ms. Daugherty's affidavit should be admitted against Defendant Broach, that a conspiracy existed among Defendants, the statements do not fall within the coconspirator exception.  The statement that Plaintiff contends is relevant to the question of Defendant Broach's personal participation is the one in which Defendant Dantis allegedly tells Ms. Daugherty that he had turned the matter concerning Plaintiff over to Defendant Broach.  However, this statement is a "mere narrative," and therefore inadmissible as beyond the scope of the coconspirator exception.  *United States v. Wolf*, 839 F.2d 1387, 1393 (10th Cir. 1988).  "Mere narratives" are not made in furtherance of a conspiracy, but rather are "statements relating to past events, even those connected with the operation of the conspiracy,

where the statement serves no immediate or future conspiratorial purpose." *Id.* (citation

omitted).  In this case, Defendant Dantis' alleged statements to Ms. Daugherty did not "promote

the conspiratorial objectives" or further the conspiracy, and so do not fall within the

coconspirator exception.  *Id.* (citing *United States v. Posner*, 764 F.2d 1535, 1538 (11th Cir.

1985), which recognized that "evidence which 'spilled the beans' regarding the conspiracy could

not be considered to have advanced any objective of the conspiracy").

Because the statements allegedly made by Defendant Dantis to Ms. Daugherty do not fall

within any exception to the hearsay rule when applied to Defendant Broach, the affidavit will not

be admitted to supplement Plaintiff's response to Defendant Broach's motion for summary

judgment.  It will be admitted to supplement his response to Defendant Dantis' motion.

2. <u>Defendant Dantis</u>

Defendant Dantis contends that Plaintiff has introduced no admissible evidence tending

to show that he was personally involved in the decision to have Plaintiff terminated.  However,

the statements attributed to him in Ms. Daugherty's affidavit provide sufficient evidence at this

stage.  Defendant Dantis argues that these statements contained in Ms. Daugherty's affidavit "do

not demonstrate that Defendant Dantis was involved in the decision to terminate Plainitff's

employment or knew about it beforehand."  Defendant Dantis' Response to Plaintiff's Motion to

Supplement [Doc. 58] at 3.  The statements, made by the Acting Director of the Department of

Substance Abuse Programs the weekend before Plaintiff was terminated, that Plaintiff and his

son could not work together at MATS and that he had turned the matter over to someone over

whom he had supervisory power, provide evidence that he knew about the decision to terminate

Plaintiff ahead of time and that he participated in that decision.  Viewing the facts in the light

most favorable to Plaintiff, a reasonable jury could infer from these statements, in light of all of

the surrounding circumstances, that Defendant Dantis participated in the decision to terminate Plaintiff, and summary judgment is therefore inappropriate.

### 3. Defendant Broach

Plaintiff has also come forward with sufficient admissible evidence to create a question of fact about whether Defendant Broach was personally involved in the decision to terminate his employment.   In his affidavit, Plaintiff states that he "witnessed [Defendant] Broach reprimand employees, including Jamie Dantis," and that he witnessed Defendant Broach "escort terminated employees out of the MATS facility."  Ex. A to Doc. 38 at ¶¶ 27, 28.   These statements, by themselves, may not be sufficient to indicate any personal involvement by Defendant Broach in the decision to terminate Plaintiff's employment.  However, Plaintiff also alleges that Defendant Broach "was present in my termination meeting, signed my termination letter on behalf of Dwight Dias,[11] and collected the MATS property from me when I was terminated."  *Id*. at ¶ 29. Together, the evidence that Defendant Broach was present at the termination meeting, that he signed the termination letter on his own behalf, and that he had disciplined employees in the past, taken in the light most favorable to Plaintiff, is sufficient to create a question of fact regarding whether Defendant Broach attended the termination meeting solely as a witness, whether he had any supervisory authority over Plaintiff, and whether he personally participated in any personnel decisions involving Plaintiff.[12]  Thus, the Court will deny Defendant Broach's

---

[11] Although Plaintiff's affidavit states that Defendant Broach signed his termination letter on behalf of Defendant Dias, this appears to be a misstatement.  A copy of the termination letter, attached as Ex. G to Doc. 38, clearly shows that Defendant Baca signed on Defendant Dias' behalf, whereas Defendant Broach signed on his own behalf.  In addition, Plaintiff's argument rests, in part, on Defendant Broach having signed in his own capacity.  *See* Doc. 38 at 14.

[12]   Plaintiff also includes statements in his affidavit and in an affidavit submitted by one of his attorneys that reference statements allegedly made to the affiants by other potential witnesses.  *See* Holland affidavit at ¶¶ 21-23; Van Meter affidavit, attached as Ex. B to Doc. 38,

motion for summary judgment on Plaintiff's retaliation claim.

## CONCLUSION

**IT IS THEREFORE ORDERED** that the Motion for Summary Judgment Based on Qualified Immunity by Defendant John Dantis [Doc. 30]is GRANTED in part and DENIED in part, that the Motion for Summary Judgment Based on Qualified Immunity by Dwight Dias [Doc. 55] is GRANTED in part and DENIED in part, that the Motion for Summary Judgment Based on Qualified Immunity by Cecilia Baca [Doc. 60] is GRANTED in part and DENIED in part, that the Motion for Summary Judgment Based on Qualified Immunity by Carl Broach [Doc. 32] is GRANTED in part and DENIED in part, and that Plaintiff's Motion to Supplement Plaintiff's Response to Defendants Dantis, Dias, and Broach's Motions for Summary Judgment [Doc. 55] is GRANTED in part and DENIED in part.

**UNITED STATES DISTRICT JUDGE**

---

at ¶¶ 1-4, 7.  None of these alleged statements constitute an exception to the hearsay rule, and will therefore not be considered by the Court for purposes of these motions.